## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **YOHANN JACKSON,** | **Civil Action No. 2:21-cv-1534** |
| *Plaintiff,* | **Judge:** |
| **v.** | **Mag. Judge:** |
| **SHAWN SNOW, SIMON BRAUD, DEVON LEBOUEF, JORY GUIDRY, and CITY OF THIBODAUX** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## COMPLAINT

Plaintiff Yohann Jackson ("Mr. Jackson") brings this civil action under federal and state laws. He contends that his rights were violated by individual officers of the Thibodaux Police Department ("TPD")—specifically, Officers Shawn Snow, Simon Braud, Devon Lebouef, and Jory Guidry (collectively, the "Defendant Officers")—and the City of Thibodaux (the "City"). Mr. Jackson alleges as follows:

### NATURE OF THE CASE

1.     This is an action for damages and declaratory relief against Defendants Shawn Snow, Simon Braud, Devon Lebouef, Jory Guidry, and the City. The Defendant Officers subjected Mr. Jackson—a 35-year-old Black man with palsy (a form of paralysis)—to unreasonable and excessive force on August 15, 2020. This conduct violated the United States Constitution, the Americans with Disabilities Act ("ADA"), and Louisiana state law.

2.     On August 15, 2020, the Defendant Officers, acting under color of state law and as agents of the City, showed up at Mr. Jackson's home in order to detain him. In effectuating his arrest and even thereafter, they used unreasonable, excessive, and unwarranted force. Despite

1

being made aware of Mr. Jackson's disability, the Defendant Officers still brutalized Mr. Jackson. Among other things, they twisted his injured arm beyond its natural range of motion; they jerked his head and inserted a finger into his ear; they applied tight handcuffs that cut and bruised his arms; and they smashed his legs and head against hard surfaces of a police car.

3.    Mr. Jackson continues to experience physical, emotional, and psychological harm as a result of the incident, including injured right and left arms, anxiety, depression, fear, nightmares, and distrust of law enforcement.

4.    Unfortunately, Mr. Jackson's story reflects a plight suffered by too many Black and disabled individuals in the United States.[1]

5.    The statistics are jarring.  As an initial matter, 50 percent of people killed by law enforcement are disabled.[2]  Black people with disabilities fare even worse, as they are killed at rates twice as high as White people.[3]  Moreover, Black people who are disabled often become entangled in the criminal legal system from a very young age—at a proportion far greater than their White peers with disabilities.[4]  At bottom, when racism, ableism, and policing intersect, they too often result in unnecessary violence, similar to that which the Defendant Officers exacted upon Mr. Jackson.

---

[1]    *See* Vilissa Thompson, *Understanding the Policing of Black, Disabled Bodies*, CTR. FOR AM. PROGRESS (Feb. 10, 2021, 10:27 AM), https://www.americanprogress.org/issues/disability/news/2021/02/10/495668/understanding-policing-black-disabled-bodies/; Abigail Abrams, *Black, Disabled and at Risk: The Overlooked Problem of Police Violence Against Americans with Disabilities*, TIME (June 25, 2020, 8:56 AM), https://time.com/5857438/police-violence-black-disabled/.

[2]    *Id.*

[3]    Fatal Force, Police Shootings Database, WP COMPANY (Jan. 1, 2015 to Aug. 5, 2021), https://www.washingtonpost.com/graphics/investigations/police-shootings-database/.

[4]    *See supra* note 1.

6.      The Defendant Officers and the City are duty-bound to protect and serve Louisianans like Mr. Jackson.[5]  They failed to do so here.  Accordingly, Mr. Jackson seeks redress for his harms and to hold those responsible accountable under federal and state laws.

## PARTIES

7.      Plaintiff Yohann Jackson is a resident of the Eastern District of Louisiana and a citizen of the United States of America.

8.      Defendant Shawn Snow was, at all relevant times herein, a citizen of the United States, a resident of the Eastern District of Louisiana, and acting under color of state law in his capacity as a law enforcement officer employed by TPD, a law enforcement agency of the City. Defendant Snow is sued in his individual capacity.

9.      Defendant Simon Braud was, at all relevant times herein, a citizen of the United States, a resident of the Eastern District of Louisiana, and acting under color of state law in his capacity as a law enforcement officer employed by TPD, a law enforcement agency of the City. Defendant Braud is sued in his individual capacity.

10.     Defendant Devon Lebouef was, at all relevant times herein, a citizen of the United States, a resident of the Eastern District of Louisiana, and acting under color of state law in his capacity as a law enforcement officer employed by TPD, a law enforcement agency of the City. Defendant Lebouef is sued in his individual capacity.

11.     Defendant Jory Guidry was, at all relevant times herein, a citizen of the United States, a resident of the Eastern District of Louisiana, and acting under color of state law in his

---

[5]   The Thibodaux Police Department Law Enforcement Code of Ethics states that a law enforcement officer's "fundamental duty" is "to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against abuse or disorder; and to respect the constitutional rights of all to liberty, equality and justice."

3

capacity as a law enforcement officer employed by TPD, a law enforcement agency of the City. Defendant Guidry is sued in his individual capacity.

12.     Defendant City of Thibodaux is a municipal corporation organized and existing under the laws of the State of Louisiana with the ability to sue and be sued within the State of Louisiana.  Defendant City provides and is responsible for public services, including the law enforcement services of TPD.  At all relevant times herein, Defendant City employed the Defendant Officers.  Defendant City is responsible for the hiring, training, supervision, discipline, administration, policies, customs, practices, operations, management, and control of TPD and its officers, including the Defendant Officers.

<b><u>JURISDICTION AND VENUE</u></b>

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This case and controversy arises under the United States Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988.  This Court has supplemental jurisdiction over all other claims asserted under the laws of the State of Louisiana pursuant 28 U.S.C. § 1367.

14.     Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b)(1)–(2).  Defendants Snow, Braud, Lebouef, and Guidry are residents of the Eastern District of Louisiana, and the City is a municipality within the Eastern District of Louisiana. Moreover, a substantial part of the events and omissions giving rise to Mr. Jackson's complaint occurred in Lafourche Parish, Louisiana, which is located within the Eastern District of Louisiana.

15.     Declaratory relief is authorized by 28 U.S.C. § 2201.  A declaration of law is necessary to determine the respective rights and duties of the parties.

## STATEMENT OF FACTS

### *Mr. Jackson's Disability*

16.     Mr. Jackson is a disabled individual.  He was born with a debilitating condition called palsy.

17.     Palsy results in partial paralysis and other neurological and physical conditions.

18.     Mr. Jackson has lived his entire life with permanent physical limitations caused by palsy—including a chronically weak and visibly shortened right arm with limited range of motion, as well as a shortened right leg.  Although Mr. Jackson has trained himself to use his right arm and leg for less strenuous activities, Mr. Jackson relies primarily on his left arm and leg to perform everyday tasks.

19.     Despite his physical limitations, Mr. Jackson was able to find work as a delivery driver and customer service representative at Pizza Hut and Papa John's Pizza.  Mr. Jackson also frequently worked one-off jobs, including assisting a local towing and wrecker service business with vehicle towing and delivering repair and maintenance automobile parts to customers.

### *The Encounter with the Defendant Thibodaux Police Officers*

20.     In the early morning of August 15, 2020, Mr. Jackson was cleaning his home.  At or around 10:00 A.M., TPD Officer Snow beat loudly on Mr. Jackson's front door.  Mr. Jackson, feeling threatened and intimidated by the loud pounding, answered the door, stepped outside onto his porch, and locked the front door behind him.

21.     Outside Mr. Jackson's home, Officer Snow and Mr. Jackson spoke.  Officer Snow told Mr. Jackson that he was responding to a reported disturbance.  The disturbance related to a complaint about a missing debit card.

5

22.    Officer Snow also stated that he smelled the odor of marijuana and instructed Mr. Jackson to reveal the location of the marijuana.  At or around this time, two other TPD officers, Officers Braud and Lebouef, arrived at Mr. Jackson's home.

23.    Mr. Jackson was fearful of being injured by Officers Snow, Braud, and Lebouef due to previous encounters with other TPD officers who had harassed and stalked him.[6]  In one such encounter, TPD officers stopped Mr. Jackson while he was on his way to the store, told him "we know what you did," and threatened him with violations and citations for crimes he did not commit.  In another instance, TPD officers followed Mr. Jackson in an unmarked vehicle late at night while he was returning home from a pizza delivery shift, pulled him over, and again threatened and intimidated him.

24.    On August 15, 2020, Mr. Jackson attempted to cooperate peacefully with Officers Snow, Braud, and Lebouef.  He informed them of the following: that he had "cerebral palsy"; that this condition meant he has a weakened right arm; that his right arm could not bend at certain angles; that he did not want any trouble; and that he would permit the three Officers to enter his home to investigate.

25.    In response, Officer Snow threatened Mr. Jackson, stating that "we're going to see today" if his arm would go behind his back.

26.    As Mr. Jackson moved his left hand, which held the keys to the front door, towards the front doorknob, and without any provocation from Mr. Jackson, Officer Snow told Mr. Jackson that he was taking too long to let the officers in.

---

[6]    Mr. Jackson's fear of the Defendant Officers is not unique and is a common fear shared by Black Americans throughout the United States.  *See* Jocelyn R. Smith Lee & Michael A. Robinson, *"That's My Number One Fear in Life.  It's the Police": Examining Young Black Men's Exposures to Trauma and Loss Resulting from Police Violence and Police Killings*, 45 J. BLACK PSYCH. 143 (July 30, 2019).

27.     Officer Snow then quickly reached for, grabbed, and jerked Mr. Jackson by his weakened right arm.  Officer Snow pulled Mr. Jackson's right arm with extreme, unreasonable, and excessive force, attempting to extend it beyond its normal range of motion in an apparent effort to spin Mr. Jackson's entire body around.  This caused Mr. Jackson to suffer sharp, tearing pains in his right bicep.

28.     Because Officer Snow was unable to fully rotate Mr. Jackson's right arm due to its limited range of motion, he told Mr. Jackson that he was resisting.

29.     Despite the great pain he felt, which was directly and proximately caused by Officer Snow's maneuvers, Mr. Jackson still attempted to comply—providing Officer Snow the keys to the front-door lock with his left hand.

30.     Upon receipt of the keys, Officer Snow, together with Officers Braud and Leboeuf, forcefully detained Mr. Jackson.  Officer Snow again grabbed, jerked, and twisted Mr. Jackson's weakened right arm behind his back.  Officers Braud and Lebouef together grabbed and restrained Mr. Jackson by his head, neck, and left arm.

31.     The three Officers did this despite the fact that Mr. Jackson posed no real or apparent threat to anyone's safety.  The fact is, the police were responding to a complaint about a missing debit card, not a potentially dangerous situation; Mr. Jackson was unarmed and there was no reason to suspect him of being armed; he made no sudden movements; and he did not verbally threaten to harm the three Officers.

32.     Accordingly, the force used by the three Officers to immobilize Mr. Jackson was objectively unreasonable, particularly because Mr. Jackson was a disabled individual who suffered from palsy and posed no threat.

33.     Adding insult to injury, at the direction of Officer Snow, Officer Braud or Lebouef inserted a finger into Mr. Jackson's right ear in order to grip his head; the Officer then pulled so hard that Mr. Jackson felt as though the cartilage and skin of his outer ear had been ripped open.

34.     Officer Snow then forcefully tugged Mr. Jackson's right arm—the one with limited mobility.  This caused Mr. Jackson additional extreme pain, as he felt his shoulder and right bicep muscles tear.

35.     Because he was experiencing extraordinary pain—in his right arm and right ear—Mr. Jackson protested the brutal actions of Officers Snow, Braud, and Lebouef.  He stated to the three Officers that they were injuring him.  He also stated again that he had "cerebral palsy." Mr. Jackson did not threaten or attempt to strike any Officer.

36.     Officers Snow, Braud, and Lebouef, however, ignored Mr. Jackson's pleas.

37.     At this point, to relieve the pain in his right arm, Mr. Jackson attempted to maneuver his body into a position in which his right arm would be under less strain.

38.     Officer Snow yelled at Mr. Jackson to stop resisting, and, together with Officers Braud and Lebouef, pulled Mr. Jackson's arms behind his back to further restrict his movement with handcuffs.  Because Mr. Jackson's shortened and inflexible right arm made it difficult for the Officers to bring his right and left wrists together, Mr. Jackson attempted to move his left arm towards his right arm in order to avoid injury, and to make it easier for the Officers to place the handcuffs on his wrists.  Despite Mr. Jackson's cooperation, the Officers continued to state that Mr. Jackson was resisting and jerked Mr. Jackson's arms into a strained and painful position.

39.     Johnny Lirette, the owner of a local wrecker service business located across the street from Mr. Jackson's home, was working at his shop while Mr. Jackson was struggling with the three Officers.  After hearing loud noises and screams of pain coming from the direction of

Mr. Jackson's home, Mr. Lirette stepped out of his shop and walked over to Mr. Jackson and the three Officers.

40.     When Mr. Lirette arrived at Mr. Jackson's home and saw Officers Snow, Braud, and Lebouef twisting Mr. Jackson's arms, Mr. Lirette told the Officers that Mr. Jackson was injured and that Mr. Jackson's right arm "can't bend like that." Officer Snow told Mr. Lirette not to step closer, so Mr. Lirette returned to his shop across the street.

41.     At or around this time, Officers Braud and Lebouef left the scene.

42.     At this point, Officer Snow used two pairs of interlocking handcuffs on Mr. Jackson. Unfortunately, this did little to assuage Mr. Jackson's pain as he had already been severely injured. Furthermore, the interlocking handcuffs encircled his wrists and arms too tightly and caused Mr. Jackson additional harm, including bruising and cuts on his wrists and arms.

43.     Approximately one hour had passed since the Officers arrived at Mr. Jackson's home.

44.     Officer Snow then ordered the now-handcuffed Mr. Jackson to sit on the front porch. Mr. Jackson, continuing to fear for his safety and well-being, complied and prayed for his life.

45.     Now alone with Mr. Jackson, Officer Snow contacted Officer Guidry to assist him at the scene.

46.     Shortly thereafter, Officer Guidry arrived with a warrant to search Mr. Jackson's house.

47.     Officer Snow presented the search warrant to Mr. Jackson, and, after unlocking the front door using Mr. Jackson's key, began to search the house. While Officer Snow searched Mr. Jackson's home, Officer Guidry stood outside and watched over Mr. Jackson.

48. After spending approximately five minutes inspecting Mr. Jackson's home, Officer Snow exited.

49. Officers Snow and Guidry then grabbed Mr. Jackson by his left and right arms and pushed him towards a police car. Mr. Jackson tried to keep pace with Officers Snow and Guidry, but he was unable to move quickly due to his disability. In an apparent attempt to move Mr. Jackson more quickly, Officer Snow twisted and lifted Mr. Jackson by his weakened right arm and carried him to the police car. While being carried, Mr. Jackson suffered excruciating pain because his entire body weight was supported only by his already-weakened and now-injured right arm and shoulder.

50. After Mr. Jackson was brought to the police car, Officer Snow returned to Mr. Jackson's home.

51. Officer Guidry stayed with Mr. Jackson, whom he then pushed and kicked into the police car. This force caused Mr. Jackson's right leg to hit the side of the car and his head to slam against a metal plate inside the car.

52. Officer Guidry then left to rejoin Officer Snow inside Mr. Jackson's house.

53. Mr. Jackson remained in the police car until the two Officers returned.

54. The force used by the Defendant Officers against Mr. Jackson from the time Officer Snow first grabbed Mr. Jackson to when Officer Guidry pushed and confined Mr. Jackson in the police car was unreasonable, excessive, and violated TPD policy on use of force and restraints. Specifically, each of the following acts, alone and in combination, constitutes excessive and unreasonable use of force by one or more of the Defendant Officers:

10

- Officer Snow's repeated grabbing, twisting, and pulling of Mr. Jackson's weakened right arm and attempts to extend it beyond its normal range of motion, including lifting Mr. Jackson, who then had to support his entire weight on his right arm;

- Officer Snow's application of overly-tightened handcuffs on Mr. Jackson's wrists and forearms;

- Officers Braud or Lebouef's grabbing, jerking, and twisting of Mr. Jackson's left arm;

- Officers Braud or Lebouef's grabbing and pulling of Mr. Jackson's head and neck, including inserting a finger into his right ear and causing the skin and cartilage of his outer ear to rip; and

- Officer Guidry's pushing and kicking of Mr. Jackson into the police car, which caused his right leg to hit the side of the car and his face to slam against a metal plate inside the car.

55.    In detaining and restraining Mr. Jackson, the Defendant Officers deliberately ignored, among other factors: Mr. Jackson's health and stated disability; Mr. Jackson's statements that the Officers were injuring him; the lack of any attempt to evade detention or otherwise flee; the lack of any nearby weapons or dangerous devices; and the non-violent nature of Mr. Jackson's suspected offense.

56.    The unreasonable and brutal mistreatment of Mr. Jackson by Officers Snow, Braud, Lebouef, and Guidry caused Mr. Jackson to suffer numerous injuries, including:

- A severely strained right arm and shoulder—both of which were already chronically weakened due to Mr. Jackson's palsy;

11

- Numbness, sharp pains, and significant losses in flexibility, structural integrity, and load-carrying capacity in his right arm and shoulder;

- A strained and disfigured left arm with numbness and sharp pains;

- A strained neck with sharp pains, stiffness, and loss of flexibility;

- Bruises and cuts on both wrists, including a loss of structural integrity in the left wrist;

- Injuries in his left and right legs, including a loss of strength and load-carrying capacity in the left knee;

- Bruises on the right side of his face; and

- A concussion that caused headaches and blackouts.

57.    Mr. Jackson has not fully recovered from his encounter with the Defendant Officers.  His persisting injuries—including headaches, pain, and loss of functionality in his right arm, left wrist, neck, and left leg—have prevented him from being able to enjoy life.

58.    Mr. Jackson's persisting injuries have also prevented him from finding gainful employment.  Due to his deteriorated physical condition resulting from his encounter with the Defendant Officers, Mr. Jackson has been unable to resume work as a delivery driver and customer service representative at Pizza Hut, his employer at the time of the incident.  Mr. Jackson's physical impairments have also prevented him from finding other employment opportunities.  His inability to work has caused him severe financial hardship, as he is a low-income individual who must support both himself and his mother with whom he lives.

59.    As a result of his encounter with the Defendant Officers, Mr. Jackson has also continued to suffer ongoing mental and emotional distress, including chronic anxiety, frustration, depression, despair, fear, nightmares, and distrust of law enforcement.

***The Thibodaux Police Department's Refusal to Provide Mr. Jackson Information Regarding Body Camera Footage***

60.     After Mr. Jackson's encounter with the Defendant Officers, Mr. Jackson sought to obtain evidence of the August 15, 2020 incident.  His attorneys submitted public records requests to TPD on April 8, 2021, pursuant to the Public Records Act of Louisiana, R.S. 44:1 *et seq*.  Ex. 1, Ltr. to Zeringue re Public Records Request, dated April 9, 2021.  Those requests sought the following information:

- Any records relating to TPD Case # H-03629-20TPD, the case concerning the encounter with the Defendant Officers;

- Any police officer body-worn cameras and/or dash camera recordings relating to the TPD Case # H-03629-20TPD;

- Any records regarding disciplinary proceedings instituted and/or complaints filed against TPD Officer Shawn Snow;

- Any records regarding disciplinary proceedings instituted and/or complaints filed against TPD Officer Simon Braud;

- Any records regarding disciplinary proceedings instituted and/or complaints filed against TPD Officer Devin Lebouef;

- Any records regarding disciplinary proceedings instituted and/or complaints filed against TPD Officer Jory Guidry; and

- The TPD Policy and Procedures Manual.

13

61.     On April 21, 2021, TPD responded.  It provided an apparently incomplete case file for TPD Case # H-03629-20TPD;[7] records of complaints and Internal Affairs investigations involving Officer Snow; and the TPD Policy and Procedures Manual.

62.     As to the requested records regarding disciplinary proceedings instituted and/or complaints filed against Officers Braud, Lebouef, and Guidry, TPD stated that it "does not have anything to provide in regards to this request."  Ex. 2, TPD Response to April 9, 2021 Public Records Request.

63.     As to requested police officer body-worn camera and/or dash camera recordings, TPD stated that "[u]nder the provisions of R.S. 44:3A(1), your request for this is being denied due to pending criminal litigation."  *Id.*  TPD did not provide any additional details justifying its denial of Mr. Jackson's request as to the camera recordings, nor did it confirm or deny the existence of such recordings.

64.     On May 13, 2021, Mr. Jackson, through his attorneys, wrote a letter to TPD regarding its deficient responses to the April 9, 2021 public records request and failure to provide police officer body-worn camera and/or dash camera recordings concerning the August 15, 2020 encounter with the Defendant Officers.  Ex. 3, Ltr. to Zeringue re Public Records Request, dated May 13, 2021.  In particular, TPD's prior response to Mr. Jackson's public records request was deficient under R.S. 44:32(D) of the Public Records Act because it did not provide an identification of the records that it had determined were exempt from inspection, copying, or reproduction, or an adequate justification for its denial of Mr. Jackson's request.  Accordingly, Mr. Jackson requested that TPD provide additional details regarding: (1) the "identity of the records that the Thibodaux

---

[7]    For example, the case file for TPD Case # H-03629-20TPD received in connection with Mr. Jackson's April 8, 2021 public records request omitted the "Supporting Narrative by Jory Guidry" dated 08/16/20, 16:51.

Police Department has determined are exempt from inspection, copying, or reproduction," and (2) "[f]or each record that the Thibodaux Police Department has determined is exempt from inspection, copying, or reproduction, the reasons and legal bases for such determination." *Id.*

65.    On May 25, 2021, TPD responded, again failing to provide additional details regarding the requested camera recordings or an adequate justification for its decision to withhold the recordings.  Ex. 4, Email to Chen, dated May 25, 2021 ("I am not quite exactly sure what you are looking for here.  The first two bullet points in your second letter have already been answered with regards to our body camera video footage in our first response.").

66.     Having failed to receive any information, including a confirmation of the identity or existence of any of the recordings requested in his April 9, 2021 public records request, Mr. Jackson, through his attorneys, again wrote to TPD on June 16, 2021.  Ex. 5, Ltr. to Zeringue, dated June 16, 2021.  In his letter, Mr. Jackson sought a certification, pursuant to R.S. 44:34 of the Public Records Act, as to whether "the requested police officer body-worn camera and camera recordings exist and are in your custody or control." *Id.*

67.    It was not until June 21, 2021—more than two months after Mr. Jackson's initial public records request—that TPD finally confirmed that police body camera recordings were created in connection with Mr. Jackson's August 15, 2020 encounter with the Defendant Officers.

68.    Litigation counsel understands that TPD has provided the body camera recordings of the incident involving Mr. Jackson on or around August 10, 2021, which is less than one week before the end of the limitations period for Mr. Jackson's claims.  Despite their best efforts, litigation counsel did not have an opportunity to review the body camera recordings by the time of the filing of this Complaint.

15

## COUNT I
**42 U.S.C. § 1983, Excessive Force in Violation of the Fourth and Fourteenth Amendments**
(Against all Defendant Officers)

69. Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

70. Mr. Jackson is a citizen of the United States, and each of the individual Defendant Officers are persons for purposes of 42 U.S.C. § 1983.

71. At all relevant times, the Defendant Officers were acting under the color of state law in their capacity as officers of TPD, and Defendants' acts or omissions were conducted within the scope of their official duties or employment with TPD.

72. At the time of the complained-of events, Mr. Jackson had a clearly established constitutional right to be secure in his person from unreasonable seizure through excessive force under the Fourth Amendment and to bodily integrity and to be free from excessive force under the Fourteenth Amendment. Any reasonable police officer would have or should have known that Mr. Jackson had such rights at the time of the complained-of conduct as they were clearly established at that time.

73. The Defendant Officers' actions and use of force, as described herein, were also malicious and involved reckless, callous, and deliberate indifference to Mr. Jackson's federally protected rights. The force used by the Defendant Officers shocks the conscience and accordingly violated Mr. Jackson's Fourteenth Amendment rights.

74. The Defendant Officers unlawfully seized Mr. Jackson by means of objectively unreasonable, excessive physical force, thereby unreasonably depriving Mr. Jackson of his freedom.

16

75.     At the time of the Defendant Officers' use of unreasonable and excessive force on Mr. Jackson, there were no factual circumstances that would have led a reasonable person to believe that Mr. Jackson posed a threat to the Defendant Officers.  There was no indication prior to the use of force that Mr. Jackson was armed, attempting to flee, or posed a threat to himself, the Defendant Officers, or others.  Mr. Jackson also stated to the Defendant Officers that he suffered from "cerebral palsy" and that his weakened right arm had limited flexibility.  He informed them of his palsy prior to the use of force and multiple times afterward as he was being injured.  Mr. Jackson also informed the Defendant Officers during the use of force that he was being injured.

76.     The Defendant Officers did not employ measured action.  Instead, they immediately resorted to force, without any attempt to de-escalate the situation or negotiate with Mr. Jackson. The Defendant Officers made no attempt at the outset to take Mr. Jackson's impairment into account.  Nor did they warn him they would use force.  The Defendant Officers failed to attempt less forceful alternatives and continued to inflict unreasonable and excessive force despite the fact that Mr. Jackson was committing no crime, posed no threat, and did not actively resist.

77.     The Defendant Officers are not entitled to qualified immunity for the complained-of conduct because their conduct violated Mr. Jackson's constitutional rights and was objectively unreasonable.

78.     As a direct and proximate consequence of the Defendant Officers' acts and omissions, including the use of force, Mr. Jackson has suffered and continues to suffer damages, including physical and emotional injury.

## COUNT II
### 42 U.S.C. § 1983, Excessive Force – Failure to Intervene in Violation of the Fourth and Fourteenth Amendments
(Against all Defendant Officers)

79. Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

80. At all relevant times, the Defendant Officers were acting under the color of state law in their capacity as officers of TPD, and Defendants' acts or omissions were conducted within the scope of their official duties or employment with TPD.

81. At the time of the complained-of events, Mr. Jackson had a clearly established constitutional right to be secure in his person from unreasonable seizure through excessive force under the Fourth Amendment and to bodily integrity and to be free from excessive force under the Fourteenth Amendment. Any reasonable police officer would have or should have known that Mr. Jackson had such rights at the time of the complained-of conduct as they were clearly established at that time.

82. At the time of each Defendant Officers' use of unreasonable and excessive force on Mr. Jackson, there were no factual circumstances that would have led a reasonable person to believe that Mr. Jackson posed a threat to the other Defendant Officers. There was no indication prior to the use of force that Mr. Jackson was armed, attempting to flee, or posed a threat to himself, the Defendant Officers, or others. Mr. Jackson also stated to the Defendant Officers that he suffered from "cerebral palsy" and that his weakened right arm had limited flexibility. He informed them of his palsy prior to the use of force and multiple times afterward as he was being injured. Mr. Jackson also informed the Defendant Officers during the use of force that he was being injured.

83. Each Defendant Officer knew that the other Defendant Officers were violating Mr. Jackson's constitutional right to be secure in his person from unreasonable seizure through

excessive force under the Fourth Amendment and to bodily integrity and to be free from excessive force under the Fourteenth Amendment.

84. Each of Defendant Officers Snow, Braud, and Lebouef were present at the scene, positioned near Mr. Jackson, could perceive the actions of the others, and assisted the others when they were violating Mr. Jackson's constitutional rights through their use of unreasonable and excessive force on Mr. Jackson.

85. Each of Defendant Officers Snow and Guidry were present at the scene, positioned near Mr. Jackson, and could perceive the actions of the other when he was violating Mr. Jackson's constitutional rights through his use of unreasonable and excessive force on Mr. Jackson.

86. Each Defendant Officer had a reasonable opportunity to realize the excessive nature of the force used by the other Defendant Officers, as well as a realistic opportunity to prevent the harm to Mr. Jackson caused by the other Defendant Officers.

87. Each Defendant Officer chose not to act to prevent the harm to Mr. Jackson caused by the other Defendant Officers and acquiesced in the violation of Mr. Jackson's constitutional rights.

88. The Defendant Officers are not entitled to qualified immunity for the complained-of conduct because their conduct violated Mr. Jackson's constitutional rights and was objectively unreasonable.

89. As a direct and proximate consequence of the Defendant Officers' acts and omissions, including the use of force, Mr. Jackson has suffered and continues to suffer damages, including physical and emotional injury.

19

## COUNT III
### Title II of the Americans with Disabilities Act, Failure to Accommodate
(Against City of Thibodaux)

90.     Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

91.     Mr. Jackson suffers from a form of palsy and therefore is a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12132.  *See* 28 C.F.R. §§ 35.108(a)(1)(i) (defining "disability" to mean a "physical or mental impairment that substantially limits one or more of the major life activities of such individual"), (b)(1)(i) (defining "physical or mental impairment" to mean "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: neurological, musculoskeletal . . . ."), (b)(2) (stating that physical or mental impairment "includes, but is not limited to, contagious and noncontagious diseases and conditions such as . . . cerebral palsy . . . muscular dystrophy . . . .").

92.     Title II of the ADA prohibits discrimination against people with disabilities through services or programs offered by State or local governments.

93.     The City is a public entity that provides and is responsible for public services, including the law enforcement services that Defendant Officers, each of whom are agents acting on behalf of the City, provide through TPD.

94.     On information and belief, as is evident by the treatment of Mr. Jackson at the hands of the Defendant Officers, the City does not provide adequate training or supervision to ensure that individuals with physical disabilities, like Mr. Jackson, are afforded fair and equal treatment in the provision of law enforcement services.

20

95.     Before and while being detained, Mr. Jackson verbally and specifically informed the City, through the Defendant Officers, that he suffered from "cerebral palsy," which, among other things, caused Mr. Jackson to have a weakened right arm with limited flexibility. Mr. Jackson's disability was also open, obvious, and apparent to the Defendant Officers, as his right arm was noticeably shorter than his left arm, and Mr. Jackson walked with a distinct gait.

96.     Prior to the use of force on Mr. Jackson, the City, through the Defendant Officers, had already secured the scene.  Furthermore, at the time, there was no apparent threat to the safety of Mr. Jackson or others.  The Defendant Officers failed in their duty to take control of the situation through less intrusive means.  In doing so, they failed to reasonably accommodate Mr. Jackson's disability.

97.     The City, through the actions of its agents, the Defendant Officers, intentionally denied Mr. Jackson the benefits of TPD law enforcement services, or otherwise discriminated against Mr. Jackson by reason of his disability.  The Defendant Officers used excessive force in detaining Mr. Jackson, including by escalating their use of force after Mr. Jackson's weakened and inflexible right arm could not bend behind his back.  In doing so, the City failed to make reasonable accommodations for Mr. Jackson's known limitations, which resulted from his disability.

98.     As a direct and proximate result of Defendant's failure to accommodate Mr. Jackson's disability and limitations, Mr. Jackson suffered and continues to suffer physical and emotional injury.

### COUNT IV
**Assault**
(Against Defendant Snow)

99.     Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

21

100. Defendant Snow committed various acts immediately preceding his physical battery of Mr. Jackson. Those actions constituted imminent threats to batter and cause physical injury to Mr. Jackson. Specifically, Defendant Snow threatened to bend Mr. Jackson's weakened and inflexible right arm beyond its natural range of motion.

101. Defendant Snow intended to threaten to batter and cause physical injury to Mr. Jackson.

102. Defendant Snow's threat of physical injury to Mr. Jackson was unreasonable, without cause or justification under the circumstances, and excessive.

103. As a direct and proximate result of the intentional conduct of Defendant Snow, Mr. Jackson suffered and continues to suffer physical and emotional injury. Mr. Jackson's injuries were caused wholly by the intentional acts of Defendant Snow.

## COUNT V
### Battery
(Against all Defendant Officers)

104. Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

105. The Defendant Officers intended to use force to cause harmful or offensive contact with Mr. Jackson, and did in fact use force to cause Mr. Jackson to suffer harmful or offensive contact.

106. The Defendant Officers' use of force caused physical injury to Mr. Jackson, was without cause or justification under the circumstances, and was excessive.

107. As a direct and proximate result of the Defendant Officers' intentional conduct, Mr. Jackson suffered and continues to suffer physical and emotional injury. Mr. Jackson's injuries were caused wholly by the intentional acts of Defendants.

22

## COUNT VI
### Intentional Infliction of Emotional Distress
(Against all Defendant Officers)

108.   Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

109.   The Defendant Officers violated Louisiana law by committing intentional torts while acting within the course and scope of their employment with TPD.

110.   At all relevant times, the Defendant Officers were acting under the color of state law.

111.   The acts or omissions of the Defendant Officers, as described herein, deprived Mr. Jackson of his constitutional rights and caused him other damages.

112.   The Defendant Officers' acts or omissions constituted extreme and outrageous conduct.

113.   As a direct and proximate cause of the intentional torts that the Defendant Officers committed as complained of herein, Mr. Jackson continues to suffer severe emotional injury and psychiatric distress.  Mr. Jackson further continues to suffer from severe and disabling distress, shock, anguish, humiliation, depression, and loss of enjoyment of life.

114.   The Defendant Officers' intentional acts or omissions are the sole cause of the aforementioned injuries that Mr. Jackson has suffered.

115.   The Defendant Officers desired to inflict severe emotional distress on Mr. Jackson or knew that severe emotional distress would be certain or substantially certain to result from their acts or omissions.

23

**COUNT VII**
**Negligence**
(Against all Defendant Officers)

116. Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

117. Each Defendant Officer owed a duty of care to Mr. Jackson to act reasonably under the circumstances.

118. Each Defendant Officer also owed a duty of care to Mr. Jackson to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Mr. Jackson, and each of the Defendant Officers was in a position to intercede to prevent the use of such unreasonable and excessive force.

119. Each Defendant Officer breached his duty of care to Mr. Jackson by failing to act reasonably under the circumstances. The Defendant Officers used unreasonable and excessive force against Mr. Jackson, an individual whom the Defendant Officers knew or should have known was disabled. The Defendant Officers' use of force was also unreasonable and excessive in view of, among other factors, the non-violent nature of the alleged offense, the minimal chance of and lack of any attempt by Mr. Jackson to escape by flight, and the lack of any actual or potential weaponry on or near Mr. Jackson.

120. Each Defendant Officer was in a position to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Mr. Jackson. By failing to intercede when the other Defendant Officers used such unreasonable and excessive force, each Defendant Officer breached his duty of care to Mr. Jackson.

121. The risk of harm from unreasonable and excessive force to Mr. Jackson was within the scope of protection afforded by the duty of care breached by the Defendant Officers.

24

122.     As a direct and proximate result of the Defendant Officers' breach of their duty of care, Mr. Jackson suffered and continues to suffer physical and emotional injuries.  Mr. Jackson's injuries were caused wholly by the acts of the Defendant Officers.

**COUNT VIII**
**Negligent Infliction of Emotional Distress**
(Against all Defendant Officers)

123.     Mr. Jackson re-alleges and incorporates all the preceding paragraphs, as if fully set forth herein.

124.     Each Defendant Officer owed a duty of care to Mr. Jackson to act reasonably under the circumstances.

125.     Each Defendant Officer also owed a duty of care to Mr. Jackson to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Mr. Jackson, and each of the Defendant Officers was in a position to intercede to prevent the use of such unreasonable and excessive force.

126.     Each Defendant Officer breached his duty of care to Mr. Jackson by failing to act reasonably under the circumstances.  The Defendant Officers used unreasonable and excessive force against Mr. Jackson, an individual whom the Defendant Officers knew or should have known was disabled.  The Defendant Officers' use of force was also unreasonable and excessive in view of, among other factors, the non-violent nature of the alleged offense, the minimal chance of and lack of any attempt by Mr. Jackson to escape by flight, and the lack of any actual or potential weaponry near Mr. Jackson.

127.     Each Defendant Officer was in a position to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Mr. Jackson.  By failing to

25

intercede when the other Defendant Officers used such unreasonable and excessive force, each Defendant Officer breached his duty of care to Mr. Jackson.

128.   The risk of harm from unreasonable and excessive force to Mr. Jackson was within the scope of protection afforded by the duty of care breached by the Defendant Officers.

129.   The Defendant Officers' use of unreasonable and excessive force on Mr. Jackson had a strong likelihood of causing, and was a direct and proximate cause of, Mr. Jackson's genuine and serious emotional injury and psychiatric distress.  Mr. Jackson further continues to suffer from severe and disabling distress, shock, anguish, humiliation, depression, and loss of enjoyment of life.

## DEMAND FOR JURY TRIAL

130.   Mr. Jackson hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

Wherefore, Mr. Jackson respectfully requests that this Court enter judgment against Defendants Snow, Braud, Lebouef, Guidry, and the City, as follows:

A.   A declaration that the Defendants' conduct violates the Fourth and Fourteenth Amendments of the United States Constitution;

B.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.   Compensation for economic losses on all claims allowed by law;

D.   Special damages in an amount to be determined at trial;

E.   Punitive damages on all claims allowed by law against Defendants and in an amount to be determined at trial;

26

F.     Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G.     Pre- and post-judgment interest at the lawful rate; and

H.     Such other relief, including other monetary and equitable relief, as this Court deems just and proper.

Dated:  August 13, 2021                         Respectfully submitted,


By:  */s/ Megan E. Snider*

Megan E. Snider
LA Bar No. 33382
Nora Ahmed*
nahmed@laaclu.org
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70112
(504) 522-0628
msnider@laaclu.org
nahmed@laaclu.org

David B. Conrad*
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070
conrad@fr.com

Philip K. Chen*
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02210
(617) 542-5070
pchen@fr.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff Yohann Jackson*

27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 13th day of August, 2021, I electronically filed a copy of the above and foregoing pleading with the Clerk of Court through use of the CM/ECF system which will send a notice of electronic filing to those who are on the list to receive e-mail notices for this case.  I further certify that I served the foregoing document and notice of electronic filing by United States Mail or e-mail to any non-CM/ECF participants.

*/s/ Megan E. Snider*
Megan E. Snider